**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**Louis Simmons and Tee and Ell Weight**
**Lifting and Exercise Enterprises, Inc.,**

      **Plaintiffs,**

-v-

      **Case No. 2:07–cv–1279**

**John Cook and Evolve, Inc.,**

      **Judge Michael H. Watson**

      **Defendants.**

## OPINION AND ORDER

Plaintiffs Louis Simmons and Tee and Ell Weight Lifting and Exercise

Enterprises, Inc. ("Plaintiffs") bring claims under the patent laws of the United States as

set forth in Title 35 of the United States Code, asserting that Defendants John Cook

and Evolve, Inc. ("Defendants") have been and continue to infringe U.S. Patent No.

6,491,607 ("the '607 patent"). Plaintiffs also bring claims under the Lanham Act as set

forth in Title 15 of the United States Code, asserting that Defendants have been and

continue to commit trademark infringement, trademark dilution, false designation of

origin, passing off, reverse passing off, misrepresentation, false advertising, and unfair

competition with respect to U.S. Trademark No. 2,724,069 for the mark LOUIE

SIMMONS ("LOUIE SIMMONS"), U.S. Trademark No. 2,935,589 for the mark

WESTSIDE BARBELL ("WESTSIDE BARBELL") and U.S. Trademark No. 3,258,406

for the mark REVERSE HYPER ("REVERSE HYPER"). Plaintiffs also bring claims

under Ohio law, asserting that Defendants have been and continue to infringe Plaintiff's

trademarks and violate the Ohio Deceptive Trade Practices Act, and have committed breach of contract by failing to pay royalties under a license agreement. Defendants bring declaratory judgment counterclaims alleging non-infringement of the '607 patent, invalidity of the '607 patent and non-infringement of the LOUIE SIMMONS, WESTSIDE BARBELL and REVERSE HYPER marks. Defendants also bring a counterclaim of abuse of process. This matter is before the Court on the motion for summary judgment filed by Defendants seeking dismissal of the patent-related claims, dismissal of the trademark-related claims, and dismissal of John Cook as a defendant. For the reasons that follow, the Court grants Defendants' summary judgment motion with respect to Plaintiffs' patent claims, but denies summary judgment with respect to Plaintiffs' trademark claims.

## I. PARTIES AND JURISDICTION

Plaintiff Louis (Louie) Simmons ("Simmons") is an individual, a citizen of the United States and of the State of Ohio, residing in Grove City, Ohio. Plaintiff Tee and Ell Weight Lifting and Exercise Enterprises, Inc. ("Tee and Ell") is an Ohio corporation with its principal place of business in Grove City, Ohio. Simmons is the assignee and owner of the '607 patent and is a statutory agent of Tee and Ell. Defendant Evolve, Inc. ("Evolve") is an Ohio Corporation with its principal place of business in Akron, Ohio. Defendant John Cook ("Cook") is an individual residing in Akron, Ohio.

Plaintiffs bring this action against Defendants pursuant to the patent laws as set forth in Title 35 of the United States Code, 35 U.S.C. § 1, *et seq.* Plaintiffs also bring this action against Defendants pursuant to the Lanham Act as set forth in Title 15 of the United States Code. 15 U.S.C. § 1051, *et seq.* Further, Plaintiffs assert claims under

Ohio trademark law as set forth in Ohio Rev. Code §§ 1329.54–1329.67, Ohio's Deceptive Trade Practices Act as set forth in Ohio Rev. Code § 4165.01, *et seq.*, and the Ohio common law of service marks, trademarks, and contracts. The Court has jurisdiction over the patent claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a), the federal trademark claims pursuant to 15 U.S.C. § 1121, 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a), and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

## II. FACTUAL BACKGROUND

Simmons is a well-known power lifter and strength coach, and is one of only six lifters to total Elite in five weight classes and is the only lifter over 50 years of age to squat 920 pounds and to total lift 2,100 pounds. Simmons has been a strength coach for twenty-five World and National lifting champions, twenty-seven lifters who total lifted 2,000 pounds, the Cleveland Browns, the Green Bay Packers, the New England Patriots, the Seattle Seahawks, and various college football teams and individual athletes. He also helped train Butch Reynolds in breaking the record for the 400 meter dash.

After sustaining a back injury, Simmons co-invented exercise machines that allow a person to lift weights and rehabilitate the back without back surgery, and was a named co-inventor on the '607 patent, issued December 10, 2002. The machine protected by the '607 patent is appropriate for commercial gyms and professional training rooms, but not for residential usage because it cannot be folded and because of its size. Additionally, the United States Patent and Trademark Office ("USPTO") issued the LOUIE SIMMONS mark on June 10, 2003 and the WESTSIDE BARBELL

mark on March 29, 2005, both of which are currently owned by Tee and Ell. The USPTO also issued the REVERSE HYPER mark, which is currently owned by Simmons, on July 3, 2007. Plaintiffs have marketed and sold the exercise machine protected by the '607 patent in association with these marks. Simmons developed a relationship with Cook for further development and marketing of these exercise machines.

Since 2005, however, Cook began development of a competing device tailored to residential usage, the CorEvolution machine, for which he eventually obtained a patent. Cook helped found Evolve and Evolve Projects, L.L.C. ("Projects"), for which Cook is now president, one of several owners, and an employee. With the help of Projects, Cook currently markets the CorEvolution machine through infomercials throughout the United States. Projects asked Simmons to appear in at least one such infomercial to endorse the CorEvolution machine. Simmons voluntarily agreed to appear, and in a written contract—the Testimonial Authorization and Release "B" ("Testimonal Authorization contract")—waived various rights associated with his appearance in the infomercial.[1] Simmons' statements made therein constitute the principal trademark uses upon which Plaintiffs' trademark-related claims are based.

On December 12, 2005, Simmons and Tee and Ell as Licensors and Evolve as Licensee entered into a written "Exclusive Patent License and Trademark License

---

[1] The contract gave Evolve the rights to "(i) [Simmons'] name, (ii) any still or moving photographic image, silhouette or sound recording of [Simmons] . . . (the "Performance"), and (iii) any statement or endorsement (including [Simmons'] letter and photograph), or any portions thereof (the "Testimonial"), made by [Simmons] . . ." Additionally, Simmons stipulated to "release, discharge, and agree to hold harmless [Evolve] from and against all liability resulting from the use of [Simmons'] name, the Performance, and the Testimonial." Further, the contract stated that Simmons' "use of the Product is voluntary and [he] assume[s] complete responsibility for [his] actions in connection therewith."

Agreement" (the "License Agreement").[2]  The License Agreement provides a license for the use of the "Licensed Patents"—the '607 patent and Plaintiffs' U.S. Patent Application 11/218,369 ("the '369 application")—and the LOUIE SIMMONS, WESTSIDE BARBELL and REVERSE HYPER marks. A "Licensed Machine" is defined as "an exercise machine for the lower back that is (1) covered in whole or in part, by any claim in the Licensed Patents, and (2) adapted for residential use by modifications that allow it to be folded and stowed." The clause "(1) covered, in whole or in part, by any claim in the Licensed Patents" refers to devices that contain all the elements of any claims of the '607 patent or any potentially issued claims of the '369 application. This license grant is further limited to sales "only through fulfillment of customer orders placed through television commercials." Finally, the License Agreement provides for a "Patent Royalty" payment by Licensee to Simmons for all Licensed Machines sold or leased by Licensee.

Defendants informed Simmons of their opinion that the CorEvolution machine was not a Licensed Machine and that they had never used the LOUIE SIMMONS, WESTSIDE BARBELL or REVERSE HYPER marks in connection with sales of the CorEvolution machine. Defendants therefore claimed that the License Agreement was inapplicable to any actions related to the CorEvolution machine and never made any royalty payments in accordance with the License Agreement. Subsequent negotiations failed, and Plaintiffs terminated the license, alleging that Defendants defaulted on the License Agreement by failing to pay royalties based on their sales of the CorEvolution

---

[2] It is undisputed that Evolve is a Licensee. However, the parties dispute whether Cook is also a Licensee. The Court will examine this issue in Part IV(D).

Machine.  Plaintiffs then filed this action.

## A. '607 Patent

### 1. Overview

The '607 patent is entitled "Apparatus and method for lower back exercise."  The patent was awarded to Simmons, Allen Johnson and George Johns, and is currently assigned to Simmons.  The patent specification discloses an exercise apparatus having a body support platform on which a user lies face downward with legs extending downward.  A pendulum is vertically suspended below the person, with the lower portion of the pendulum having a sleeve slidably engaged with the pendulum.  The sleeve is also pivotally connected to a resistance transfer apparatus, on which the user's legs are retained.  The exercise raises the user's legs from a vertical rest position to a horizontal position, and then lowers the legs from the horizontal position through and past the vertical rest position in a total motion greater than 90 degrees.  The body support platform may be adjusted to various angles with respect to the horizontal, and weights may be added to the pendulum.

Figure 1 of the patent shows a drawing representative of the exercise apparatus.



*Fig. 1*

'607 Patent, Fig. 1.

## 2. Prosecution History

The application which resulted in the '607 patent was filed on March 6, 2001. The application set forth twenty claims. In a non-final office action, the Examiner rejected application claims 1–4, 7–10, 12, 18 and 19, objected to application claims 5, 6, 11, 13–15 and 20, and allowed application claims 16 and 17.

Application claims 1–2 and 18–19 were rejected under 35 U.S.C. § 102(b) as anticipated by the Simmons patent, U.S. Patent No. 5,356,359 ("Simmons '359"). Application claims 3–4 were rejected under 35 U.S.C. § 103(a) as being unpatentable over Simmons '359. Claims 7–10 and 12 were rejected under 35 U.S.C. § 103(a) as being unpatentable over Simmons '359 and further in view of the Jones patent, U.S. Patent No. 5,066,003 ("Jones '003").

Application claims 5, 6, 11, 13–15 and 20 were rejected as being dependent upon rejected base claims, but stated that these dependent claims would be allowable if rewritten in independent form to include all of the limitations of their base claims and intervening claims.

In response, applicants canceled application claims 1–4, 12 and 18. Applicants amended application claims 5 and 11 to include all limitations in application claim 1 except for the limitation of removably connecting weights to the pendulum as set forth in sub-paragraph (d), stating that this limitation was not necessary to distinguish the amended claims over the prior art. Applicants also amended application claim 13 to include all limitations in application claim 12 and amended application claim 20 to include all limitations in application claim 18.

The Examiner then issued a Notice of Allowability for all fourteen remaining claims, and the '607 patent was issued by the USPTO on December 10, 2002 with fourteen renumbered claims. Application claim 5 became issued claim 1, application claim 13 became issued claim 8, and application claim 17 became issued claim 11. The '607 patent is currently assigned to Simmons.

## B. The Accused Device

Plaintiffs allege that Defendants' CorEvolution machine infringes the '607 patent. The figure below shows a drawing that is representative of the CorEvolution machine.



Defs.' Mot. for Summ. J. (Doc. 28).

## C. Accused Trademark Uses

Simmons made several statements in the infomercial which Plaintiffs argue were unauthorized uses of their trademarks. Specifically, Simmons made three appearances in the commercial which identified him with a caption while he spoke about the CorEvolution machine and the reverse hyperextension exercise:

FIRST APPEARANCE:

Infomercial Host: "The [story] behind the creation of the CorEvolution trainer could have come right out of a Hollywood movie. It's the story of a man who overcame adversity and injury because he refused to give up on his dream and wouldn't accept the conventional answers to back pain."

Simmons: "In 1973 I thought my back was indestructible. Then I fractured my fifth lumbar vertebrae. I was on my floor in my living room, couldn't even get into my bed, and no one was there to help me. Going to several doctors and therapists gave me absolutely no hope, and I on my own came up with the reverse hyperextension exercise, which absolutely cured me. I knew what it would do for the general public because I knew what it did for me, and in 1993 I decided to patent it, making it available to all commercial gyms, major colleges, and chiropractic offices, and pain centers. The CorEvolution is small; it's very affordable, and very effective, and everyone can use it, from the housewife, to the weekend athlete, to the golfer, everybody."

SECOND APPEARANCE:

Simmons: "Because my name Louie Simmons is associated with strength training, umm, many gyms would only buy it for people in the, in the strength activities. They didn't realize that first and foremost it's a rehab device. If my name was Dr. Louie Simmons, I would've already sold millions of these machines. When people have these, they realize that this is something you cannot do without."

THIRD APPEARANCE:

Simmons: "This machine, for the woman of the house, will completely rebuild their lower body. It has a very shaping effect on women. For the man, it's going to build up the glutes, and the glutes is the missing [link] of back problems, because it's the glutes that are between the hamstrings and the spinal rectors, and it's a tremendous glute builder."

Plaintiffs submitted several new exhibits in response to Defendants' summary judgment motion, which evince instances of alleged trademark infringement that Plaintiffs failed to disclose during discovery. The Court denied Defendants' motion to strike these exhibits, but reserved its decision to disregard these exhibits until responding to this summary judgment motion. Order denying Defs. Mot. To Strike

(Doc. 43). Accordingly, the Court will determine whether to disregard these exhibits in Part IV(B) when ruling on the trademark-related claims.

The most important exhibit among these is a posting by Cook on www.goheavy.com, which is an internet website that provides discussion boards for weightlifting enthusiasts. Cook posted:

> "Spread the WORD!!! I have spent almost 4 years working on this project for Louie and it is finally coming together. We have had great success so far and we look to really skyrocket in the months to come The CorEvolution is exactly like the *Reverse Hyper*, but it is very light...." (emphasis added)

The remaining instances of alleged infringement are all internal e-mails between John Cook and colleagues who helped him develop and market the CorEvolution machine, where they referred to the CorEvolution machine as either the "Reverse Hyper" or "Hyper."

### D. The Instant Action

Plaintiffs filed the Complaint (Doc. 2) against Defendants on December 20, 2007. Defendants filed an Answer to the Complaint and counterclaimed (Doc. 7) on January 30, 2008. Defendants subsequently filed an Amended Answer on January 31, 2008 (Doc. 8).

On October 31, 2008, Defendants filed a Motion for Summary Judgment (Doc. 28) seeking to dismiss all of Plaintiffs' claims in this suit. Specifically, Defendants request a ruling of non-infringement with respect to the '607 patent,[3] a dismissal of

---

[3] Defendants also set forth a defense of non-infringement of the '369 application. However, Plaintiffs never asserted the '369 application in this litigation, nor does a patentee have standing to initiate a patent infringement action until the patent issues. *See GAF Building Materials Corp. v. Elk Corp.*, 90 F.3d 479, 482–83 (Fed. Cir. 1996) ("Patent rights are created only upon the formal issuance of the patent; thus, disputes concerning patent validity and infringement are necessarily hypothetical before patent

Plaintiffs' trademark-related claims, a dismissal of Plaintiffs' contract claims and a

dismissal of Cook as a party to this action. The issues for summary judgment are fully

briefed and ripe for the Court's review.

### III. SUMMARY JUDGMENT STANDARDS

The standard governing summary judgment is set forth in Federal Rule of Civil

Procedure 56(c), which provides:

> The judgment sought should be rendered if the pleadings, the discovery and
> disclosure materials on file, and any affidavits show that there is no genuine
> issue as to any material fact and that the movant is entitled to judgment as a
> matter of law.

Fed. R. Civ. P. 56(c).

Summary judgment is appropriate where, after making all inferences in favor of

the nonmoving party, there are no genuine issues of material fact and the moving party

is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986); *U.S. Philips Corp. v. Iwasaki Elec. Co. Ltd.*, 505 F.3d

1371 (Fed. Cir. 2007). A genuine issue exists if the evidence is such that a reasonable

jury could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986); *Research Corp. Techs., Inc. v. Microsoft Corp.*, 536 F.3d 1247, 1254 (Fed.

Cir. 2008).

### A. Summary Judgment in Patent Cases

Summary judgment is particularly appropriate in cases where claim construction

is the material dispute between the parties. Upon construction of the claims, summary

judgment may follow when it is shown that after drawing all reasonable factual

---

issuance.").

inferences in favor of the non-movant, infringement can be reasonably decided only in favor of the movant. *Voice Technologies Group, Inc. v. VMC Systems, Inc.*, 164 F.3d 605, 612 (Fed. Cir. 1999). "Summary judgment on the issue of infringement [or noninfringement] is proper when no reasonable jury could find that every limitation recited in a properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents." *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005). Although infringement under the doctrine of equivalents is a question of fact, "[w]here the evidence is such that no reasonable jury could determine two elements to be equivalent, district courts are obliged to grant partial or complete summary judgment." *Depuy Spine, Inc. v. Medtronic Sofamore Danek, Inc.,* 469 F.3d 1005, 1013, 1017 (Fed. Cir. 2006) (quoting *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n.8 (1997)).

### B. Summary Judgment in Trademark Cases

To defeat a summary judgment motion attempting to dismiss Lanham Act claims under 15 U.S.C. § 1114 and 15 U.S.C. § 1125, the non-movant must demonstrate the existence of genuine factual disputes regarding whether the alleged infringement gives rise to a likelihood of confusion in the marketplace. *Holiday Inns, Inc. v. 800 Reservation, Inc.*, 86 F.3d 619, 622-623 (6th Cir. 1996) (citation omitted).

### IV. DISCUSSION

### A. The Patent Claims

Plaintiffs, to prevail on their patent infringement claim, must establish by a preponderance of the evidence that Defendants' accused device infringes on one or

more claims of the patent. *See Advanced Cardiovascular Systems, Inc. v. Scimed Life Systems, Inc.*, 261 F.3d 1329, 1336 (Fed. Cir. 2001). Determination of a claim of infringement involves a two-step process. First, the court must construe the patent claims as a matter of law. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372-74 (1996). Second, the claims, as construed, are compared to the accused device, and the factfinder—here, the Court for purposes of summary judgment—must determine whether the accused device infringes one or more claims of the patent either literally or under the doctrine of equivalents. *WMS Gaming, Inc. V. Int'l Game Tech.*, 184 F.3d 1339, 1346 (Fed. Cir. 1999).

Accordingly, the Court will engage in claim construction utilizing the standards set forth herein. In construing the claims, the Court will consider the relevant portions of the parties' briefing of the pending summary judgment motion addressing claim construction. The Court will not consider the accused devices in construing the claim terms. After claim construction, the Court will then move on to the second step of the process, determining whether the accused device contains each limitation of the construed claims.

For the following reasons, the Court finds that no genuine issues of material fact are in dispute and that Defendants are entitled to summary judgment of non-infringement with respect to the '607 patent because no reasonable jury could find that the CorEvolution machine infringes the '607 patent under the Court's construction of the asserted claims.

### 1. Claim Construction

### a. Claim Construction Standards

The claims of a patent define the metes and bounds of the patentee's right to exclude others from utilizing its invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citation omitted). "[C]onstruction of a patent, including terms of art within its claim, is exclusively within the province of the court." *Markman*, 517 U.S. at 372.

In *Phillips*, the Federal Circuit set forth guidelines for courts to follow in construing claims. The *Phillips* court identified four sources a court should reference when faced with claim construction: (1) the words of the claims; (2) the specification; (3) the prosecution history; and (4) extrinsic evidence. There is no rigid formula to follow for claim construction analysis, so the court emphasized the importance of "attach[ing] the appropriate weight" to each consulted source. *Id.* at 1324 (citation omitted). The main goal for a court's analysis is to understand the value and importance of each source, and use it accordingly to "comprehend how a person of ordinary skill in the art would understand the claim terms." *Id.*

The *Phillips* court set forth the basic principles of claim construction by emphasizing the importance of plain meaning. Since a patentee is required to accurately and throughly describe the invention in the claim, the court reasoned interpretation should begin with plain meaning analysis, interpreting the claim "'from the plain import of its terms.'" *Id.* at 1312 (citation omitted). The court noted "plain meaning" meant the ordinary meaning as perceived by "a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313. The court reasoned it is necessary to construe claims in the eyes of a person of ordinary skill in the field of the

invention because they can understand the term's special meaning or unorthodox usage unbeknownst to a lay judge. *Id.*

Although the court recognized dictionaries can be useful at times when a claim term has a meaning "readily apparent even to lay judges . . . the meaning of a claim term as understood by persons of ordinary skill in the art is often not immediately apparent, and . . . patentees frequently use terms idiosyncratically." *Id.* at 1314. Therefore, the court stressed the importance of referencing sources "'that show what a person of skill in the art would have understood disputed claim language to mean.'" *Id.* (citation omitted). The court stated that to interpret a claim term, a person of ordinary skill in the art would consult the words of all the claims, the remaining part of the patent specification, and the prosecution history. *Id.* at 1313. According to the court, reviewing these sources at the start of analysis is a crucial step of interpreting claim language. *Id.*

The *Phillips* court stressed "the context in which a term is used in the asserted claim can be highly instructive." *Id.* at 1314. It stated that other claims of the patent can be particularly useful to the court, and when analyzed, should be "read in view of the specification, of which they are a part." *Id.* at 1315 (citation omitted). Reaffirming the assertions of an earlier claim construction decision, the court noted that in addition to the words of the claims, "the specification 'is the single best guide to the meaning of a disputed term.'" *Id.*

Title 35 U.S.C. § 112, ¶ 1 requires the specification to "describe the claimed invention in 'full, clear, concise, and exact terms.'" *Id.* at 1316. The *Phillips* court asserted that this "statutory role" makes the specification an important and useful tool

when interpreting claim language since "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* Because the specification is written by the patentee, the court explained that it may contain important disclaimers or special definitions otherwise unknown even to a person of ordinary skill in the art. *Id.* In a case where the patentee reveals a special definition, the court stated that it is then the patentee's definition that governs as opposed to the term's normal, technical definition. *Id.* While emphasizing the importance of referencing the specification, the court suggested that it is proper to also "consider the patent's prosecution history." *Id.* at 1317 (citation omitted).

The prosecution history includes all relevant information submitted to the Patent and Trademark Office ("PTO") for examination of the proposed patent, *id.* At 1317 (citation omitted), and "provides evidence of how the PTO and the inventor understood the patent." *Id.* The court reasoned that since the prosecution history portrays the inventor's original description of the patent, the court would be able to see whether the claim's scope was intentionally limited during the negotiation process between the patentee and the PTO. *Id.* The court, however, stated that evidence derived from the negotiation process "often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* Although evidence from the prosecution history may be helpful, the court suggested it may also be necessary to reference extrinsic evidence if further insight is needed into the meaning and scope of the claim. *Id.*

The *Phillips* court made clear that extrinsic evidence should be referenced as a last resort when interpreting a patent claim. It stated that "while extrinsic evidence 'can

shed useful light on the relevant art,' . . . it is 'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Id.* (citation omitted). The court noted extrinsic evidence included sources such as dictionaries, treatises, and expert testimony, all of which would result in unreliable interpretations if relied on too heavily. *Id.* at 1319. The court stated technical dictionaries may provide an idea as to how a term in the art would be used, but fail to take into account the explanation of the claim term by the patentee and the use of the language surrounding the term. *Id.* at 1318.

Similarly, the court recognized expert testimony can be useful, but is not without its own share of shortcomings. The court suggested this testimony can be helpful "to a court for a variety of purposes, such as to provide background on the technology at issue . . . or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* However, the court warned that this testimony runs the risk of being biased and should not be considered when "'clearly at odds with the claim construction mandated by the [intrinsic evidence].'" *Id.* (citation omitted). The court concluded by explaining extrinsic evidence is less reliable than other evidence, but "the court should keep in mind the flaws inherent in each type of evidence and assess that evidence accordingly." *Id.* at 1319.

In its analysis of the utilization of extrinsic evidence, the en banc court in *Phillips* clarified its holding in *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002) (relying extensively on the use of dictionaries, encyclopedias and treatises when determining the meaning of a claim term). The *Phillips* court explained that *Texas Digital* relied heavily on extrinsic sources and improperly limited the

relevance of the patent's specification. *Phillips*, 415 F.3d at 1320. The court stressed that using a dictionary focused on "the abstract meaning of words" instead of appropriately reading the term in context. *Id.* at 1321. The context surrounding the term can shed light on the meaning intended by the patentee, and the court reasoned that using a dictionary runs the risk of overlooking this intended meaning. *Id.*

The court addressed *Texas Digital* because subsequent decisions relied on its ruling to assign meanings to claim terms that were clearly contrary to the context of the patent's claim description. *Id.* at 1321. Assigning such overly broad meanings was becoming a problem, and the en banc *Phillips* court wanted to make clear that the problem would be diminished by addressing the patent's intrinsic evidence before anything extrinsic. *Id.* The court suggested the meaning of the term when consulting the patent as opposed to extrinsic evidence would often render completely different results "because the patent by its nature describes something novel." *Id.* at 1322. The court concluded it was inappropriate to then assign a different meaning to a claim due to "the preferences of a particular dictionary editor." *Phillips*, 415 F.3d at 1322.

The court did not, however, completely ban the consultation of extrinsic sources. As it noted in its explanation of the principles of claim construction analysis, the court recognized dictionaries could be helpful in "understanding the commonly understood meaning of words," and could be particularly helpful when the dictionary definition was consistent with the meaning "ascertained by a reading of the patent documents." *Id.* (citation omitted). Thus, the court cautioned that relying primarily on extrinsic sources could yield incorrect results, and that to remain consistent with the principles of claim construction, the ruling in *Texas Digital* is not to be followed.

After distinguishing and clarifying *Texas Digital*, the court also explained "that if a patent describes only a single embodiment, the claims of the patent [do not have to] be construed as being limited to that embodiment." *Id.* at 1323 (citation omitted). The court was adamant in noting that requiring such a limitation has been expressly rejected before, and is thus rejected again. The court stated that "persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments," and thus, there would be no reason for the court to do so. *Id.*

The *Phillips* court ended its analysis by stating that there is no magic formula to follow when interpreting a claim. *Id.* at 1324. The court stressed that the main goal in claim construction is "to increase the likelihood that a court will comprehend how a person of ordinary skill in the art would understand the claim terms," so the court set out an approach to assist courts in attaining that goal. *Id.* at 1324. The approach was not rigid nor complicated; rather, the court had "simply attempted to explain why . . . certain types of evidence are more valuable than others." *Phillips*, 415 F.3d at 1324.

### b. Claim Construction of the '607 Patent

The '607 patent contains fourteen claims, including five independent apparatus claims and nine dependent claims. Plaintiffs assert independent claims 1, 8 and 11 in this action.[4] The parties focus on the interpretation of the phrases "a sleeve slidably

---

[4] Plaintiffs did not specify in their Complaint (Doc. 2) which claims of the '607 patent the accused device infringes. Defendants' motion for summary judgment identified independent claims 1, 8 and 11 as Plaintiffs' only asserted independent claims. Defs.' Br. in Sup. of their Mot. for Summ. J. at 10 (Doc. 28). Plaintiffs' response did not rebut this identification. *See* Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 32). As such, the Court accepts independent claims 1, 8 and 11 as the only asserted independent claims. These claims recite in full:

1. An apparatus for lower back exercise, the apparatus comprising: a. a support structure, the support structure further comprising a body support platform supported by the support structure; b. a pendulum, the pendulum having an upper portion and a lower portion; the upper portion of the pendulum pivotally

engaging the pendulum" and "the sleeve pivotably connected to the resistance transfer apparatus" common to all three asserted claims.

The parties dispute only the proper construction of the claimed element "sleeve," which is common to all asserted independent claims. Defendants interpret the "sleeve" to be: "*a tubular part designed to fit over another part.*" Defs.' Br. in Supp. of their Mot. for Summ. J. at 11 (Doc. 28). Plaintiffs offer the alternative interpretation of: "*a conduit designed to fit over another part.*" Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J. at 19–21 (Doc. 32).

---

connected to the support structure below the body support platform; c. a resistance transfer apparatus pivotably connected to the lower portion of the pendulum; the resistance transfer apparatus pivoting in a plane substantially parallel to the plane of the pendulum while engaging the legs of a person exercising; and, d. the lower portion of the pendulum having a sleeve slidably engaging the pendulum; the sleeve pivotably connected to the resistance transfer apparatus. '607 Patent, Claim 1.

8. An apparatus for lower back exercise comprising: a. a pendulum having an upper and a lower portion, the pendulum pivotably disposed below a person exercising; b. a resistance transfer apparatus pivotably connected to the lower portion of the pendulum; the resistance transfer apparatus further comprising: (1) a mounting assembly for pivotably connecting to the lower portion of the pendulum; (2) a central bar connected to the mounting assembly; and, (3) at least one pair of resistance rods connected to the central bar and disposed perpendicular to the long axis of the central bar on opposite sides thereof, for engaging the legs of a person exercising; and, c. the lower portion of the pendulum having a sleeve slidably engaging the pendulum; the sleeve pivotably connected to the resistance transfer apparatus by means of a mounting assembly. '607 Patent, Claim 8.

11. An apparatus for lower back exercise comprising: a. a support structure, the support structure further comprising a body support platform supported by the support structure; b. a pendulum, the pendulum having an upper portion and a lower portion, the upper portion of the pendulum having a bearing; the pendulum being pivotably connected to the support structure with the bearing, below the body support platform; the pendulum further comprising: (1) a frame connected to the lower portion of the pendulum; (2) one or more weights removably connected to the frame; (3) a sleeve slidably engaging the pendulum; and, (4) an adjustable lock for adjustably fixing the sleeve to the pendulum; and, c. a resistance transfer apparatus pivotably connected to the sleeve by means of a mounting assembly; the mounting assembly comprising a fork and a pin for pivotably connecting to the sleeve; the resistance transfer apparatus pivoting in a plane substantially parallel to that of the pendulum while engaging the lower legs of a person exercising; the resistance transfer apparatus further comprising: (1) a central bar connected to the mounting assembly; and, (2) at least one pair of resistance rods connected to the central bar and disposed perpendicular to the central bar on opposite sides thereof, for engaging the legs of a person exercising; and, (3) one or more pads; the pads having a circular cross-section and concentric holes; the holes sized so that the pads each receives one of the resistance rods. '607 Patent, Claim 11.

The parties agree on the proper construction of two further elements that are common to the asserted independent claims: a sleeve "slidably engaging" the pendulum, and the sleeve and a resistance transfer apparatus being "pivotably connected." The parties interpret a sleeve "slidably engaging" the pendulum to mean that "*the sleeve is interlocked with the pendulum in such a mannr that it is able to move smoothly along the surface of the pendulum.*" Defs.' Br. in Supp. of their Mot. for Summ. J. at 12 (Doc. 28); Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J. at 19, 21–23 (Doc. 32). The parties interpret the sleeve and a resistance transfer apparatus being "pivotably connected" to mean that "*the sleeve is joined or linked to the resistance transfer apparatus in such a manner that it is capable or able to turn on or as if on a shaft or pin.*" Defs.' Br. in Supp. of their Mot. for Summ. J. at 12 (Doc. 28); Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J. at 19, 23–24 (Doc. 32).

The Court accepts the parties' agreed-upon construction of the claim elements "slidably engaging" and "pivotally connected," and will determine the construction of the disputed element "sleeve."

### i. Construction of "Sleeve"

The relevant portions of independent claims 1 and 8 containing the term "sleeve" recite "the lower portion of the pendulum having a sleeve slidably engaging the pendulum; the sleeve pivotably connected to the resistance transfer apparatus. . ." '607 Patent Claim 1; '607 Patent, Claim 8. The relevant portion of independent claim 11 containing the term "sleeve" recites "(3) a sleeve slidably engaging the pendulum; and, (4) an adjustable lock for adjustably fixing the sleeve to the pendulum; and, c. a resistance transfer apparatus pivotably connected to the sleeve by means of a

mounting assembly..." '607 Patent, Claim 11.

Defendants, in support of their construction, note that if one refers to a dictionary, the ordinary meaning of "sleeve" is "*a tubular part designed to fit over another part.*" Defs.' Mot. for Summ. J. at 11 (Doc. 28) citing MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003). Defendants contend that consultation of a general purpose dictionary is helpful in the instant case because "the terms employed for the disputed elements of the asserted claims are readily understood by a lay person, particularly when considered in light of the patent specification and its prosecution history." Defs.' Mot. for Summ. J. at 8, 10 (Doc. 28) (citing *Phillips*, 415 F.3d at 1314). Defendants supported this conclusion by noting that the "claims are directed to an exercise machine of a very simple design having two moving parts" and that there "is no special definition apparent from the patent specification that should be accorded to any of the claim terms respecting these simple structures." *Id.*

Plaintiffs accept Defendants' construction, except they suggest that the term "*tubular*" should "not be interpreted to further infer a limitation of 'cylindrical[.]'" Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J. at 19 (Doc. 32). First, Plaintiffs suggest that the '607 patent defines a non-cylindrical sleeve, in that it "illustrates a rectangular pendulum, and then states that '[t]he sleeve (170) has a cross section that is congruent with that of the pendulum (120) and slidably fit over the pendulum (120). . .' Therefore the key aspect is that the sleeve fits upon the shape of the pendulum, not that it be tubular, rectangular, or any other particular shape." *Id.* at 19 citing '607 Patent, col. 5, ll. 14-16. Second, Plaintiffs suggest that although Merriam-Webster might define "tubular" as requiring a cylindrical shape, other references define "tubular" as including non-

cylindrical shapes.  Third, Plaintiffs note that unrelated patents in the mechanical arts disclose non-cylindrical, partially open sleeves.  *Id.* citing U.S. Pat. No. 5,579,949  ("the '949 patent"); U.S. Pat. No. 4,899,474 ("the '474 patent").  Therefore, Plaintiffs recommend replacing the term "*tubular part*" with "*conduit*" such that the construction of "sleeve" is "*a conduit designed to fit over another part*" that includes non-cylindrical and/or open shapes.  *Id.*

The Court agrees with Plaintiffs that the "sleeve" cannot be limited to cylindrical shapes.  The *Phillips* court found the patent specification to be "the single best guide to the meaning of a disputed term," 415 F.3d at 1315, and the '607 patent specification clearly illustrates a rectangular sleeve engaging a rectangular pendulum.  '607 Patent, Fig. 1; col. 5, ll. 14-16.

The Court now turns to whether the "sleeve" includes open shapes and/or discontinuous structures by first examining the patent intrinsic documents.  The '607 patent specification discloses a closed and continuous sleeve that is flush with the pendulum it encloses, '607 Patent, Fig. 1; col. 5, ll. 14-16, but does not explicitly limit "sleeve" to such a structure.  The prosecution history provides no further guidance. Because *Phillips* requires that a claim element need not be limited to embodiments disclosed in the patent specification, a conclusion limiting the "sleeve" to closed and continuous shapes is premature.  Having exhausted intrinsic documents, the Court must therefore turn to extrinsic evidence to resolve the issue.

The Court agrees with Plaintiffs that unrelated patents show that those of ordinary skill in the mechanical arts may understand a "sleeve" to include partially open shapes.  The '949 patent and '474 patent each show a C-shaped sleeve that wraps

around approximately three-fourths of an enclosed object's circumference. '949 Patent, Figs. 1, 2; '474 Patent, Figs. 1–8. Moreover, the fact that the '607 patent does not modify "sleeve" with any preceding terms, while the '949 and '474 patents explicitly modify "sleeve" with "C-shaped" or "open," does not imply that the unmodified "sleeve" term is limited to closed shapes as Defendants' suggest. Rather, an unmodified "sleeve" includes both open and closed shapes, while an "open sleeve" excludes closed shapes and a "closed sleeve" excludes open shapes.

Dictionary definitions are also helpful in marking the definitional bounds of the claim term "sleeve." The *Phillips* court recognized that, in some cases, the ordinary meaning as understood by a person of skill in the art may be readily apparent to a lay judge. "In such cases, claim construction involves little more than application of the widely accepted meaning of commonly understood words. *Phillips*, 415 F.3d at 1314. "In such circumstances, general purpose dictionaries may be helpful." *Id.*

The Court also finds here that the term "sleeve," as understood by a person of skill in the art, is limited to a single continuous object. The Oxford English Dictionary defines a "sleeve" as a "tube, or hollow shaft, fitting over or enclosing a rod, spindle, etc., and designed to protect or strengthen it, or to connect one part with another" and alternatively as a "close-fitting protective cover or case[.]" OXFORD ENGLISH DICTIONARY, Vol. XV, 684 (2d ed. 1989). *See Brita Wasser-Filter-Systeme v. Recovery Engineering, Inc.*, 243 F.3d 560, 2000 WL 1375170, at *4 (Fed. Cir. 2000) (citing the Oxford English Dictionary definition as support for a finding that the claim term "sleeve" was "commonly understood" to be a "continuous structure that fits over and around another structure"

and elaborating that while a sleeve "may be made up of several pieces, these pieces must be affixed to one another to form a single continuous sleeve.")

This meaning derived from extrinsic sources is consistent with the usage of the term in the patent intrinsic documents. Neither the '607 patent specification nor prosecution history explicitly limit the "sleeve" to any particular structure.

### ii. Court's Construction of "Sleeve"

For the foregoing reasons, the Court finds that "sleeve" means: "*a conduit designed to fit over another part, wherein the conduit includes cylindrical or non-cylindrical shapes, includes closed or partially open shapes, and forms a single continuous structure.*"

### 2. Literal Infringement

### a. Literal Infringement Standards

An accused product literally infringes a patent when it has every element set forth in the patent's claims. *Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed. Cir. 1985). "It is ... well settled that each element of a claim is material and essential, and that in order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device." *Id.*

In determining whether an accused device infringes, the accused device is to be compared with the language of the patent's claims, not to the embodiments or specific examples provided in the patent. *Spectrum Intern., Inc. v. Sterilite Corp.*, 164 F.3d 1372 (Fed. Cir. 1998). As a general rule, claims of a patent are not limited to the preferred embodiment or to the examples listed within the patent specification. *Dow*

*Chemical v. United States*, 226 F.3d 1334, 1342 (Fed. Cir. 2000). Thus, "when the specification describes the invention in broad terms, accompanied by specific examples or embodiments, the claims are generally not restricted to the specific examples or the preferred embodiments unless that scope was limited during prosecution." *Kinik Co. v. Int'l Trade Com'n*, 362 F.3d 1359, 1364-65 (Fed. Cir. 2004) (citation omitted); *Intel Corp. v. Int'l Trade Com'n*, 946 F.2d 821, 836 (Fed. Cir. 1991) ("Where a specification does not require a limitation, that limitation should not be read from the specification into the claims."). However, the absence of even one claimed element will defeat a claim for literal infringement. *See S. Bravo Systems, Inc. v. Containment Techs. Corp.*, 96 F.3d 1372, 1376 (Fed. Cir. 1996); *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991) ("To establish infringement, every limitation set forth in a patent claim must be found in an accused product or process exactly or by a substantial equivalent.").

### b. Literal Infringement of the '607 Patent

The Court finds, as a matter of law, that Defendants' accused device does not literally infringe the '607 patent because no reasonable jury could conclude that the device contains every element set forth in the asserted claims 1, 8 and 11 of the '607 patent. In the preceding sections on claim construction, this Court ascertained the meaning and boundaries of the phrases "a sleeve slidably engaging the pendulum" and "the sleeve pivotably connected to the resistance transfer apparatus," which are substantially common to all asserted independent claims.[5] Pursuant thereto, for literal

---

[5] Although claim 11 recites these elements in a slightly different order, this alternative ordering is immaterial to the meaning of the claims.

infringement of claims 1, 8 and 11, the accused device must contain:

> 1. A sleeve that is a conduit designed to fit over another part, wherein the conduit includes cylindrical or non-cylindrical shapes, includes closed or partially open shapes, and forms a single continuous structure.
> 2. The sleeve is interlocked with a pendulum in such a manner that it is able to move smoothly along the surface of the pendulum.
> 3. The sleeve is joined or linked to the resistance transfer apparatus in such a manner that it is capable or able to turn on or as if on a shaft or pin.

See supra, Section II(B)(1)(b). Claim 11 additionally recites "a resistance transfer apparatus pivotably connected to the sleeve by means of a mounting assembly; the mounting assembly comprising a fork and a pin for pivotably connecting to the sleeve[.]" '607 Patent, Claim 11 (emphasis added). The extra element is not recited by claims 1 and 8.

Based upon the Court's construction, Plaintiffs must, at a minimum, demonstrate that there is a material issue of fact regarding the existence of such a sleeve and related elements in the accused device, such that a reasonable jury could find that the accused device contains such a sleeve and related elements.

Defendants argue that the CorEvolution machine cannot literally infringe because it does not include a sleeve element slidably engaging the pendulum and pivotally connected to the resistance transfer apparatus as required by the asserted claims of the '607 patent. Defs.' Br. in Supp. of their Mot. for Summ. J. at 13 (Doc. 28).

Plaintiffs respond that the sleeve of the accused device is formed by two side forks and the central bar of the resistance transfer apparatus, which surround the pendulum on three sides and serve as a conduit within which the pendulum is contained. Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J. at 21 (Doc. 32). Plaintiffs

further argue that a user can unpin the two side forks from the pendulum and manually slide the forks along the surface of the pendulum, and therefore the sleeve slidably engages the pendulum as required by the asserted claims. *Id.* at 22.

Defendants reply that the two side forks and central bar of the resistance transfer apparatus on the accused device do not contain the pendulum and do not provide resistance to the removal of the pendulum, and therefore do not constitute a sleeve. Defs.' Reply to Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J. at 8-9 (Doc. 36). Defendants further argue that the side forks and central bar of the resistance transfer apparatus do not slide against the pendulum while at the same time being engaged to the pendulum, and therefore do not slidably engage the pendulum as required by the asserted claims. *Id.* at 10. They suggest that Plaintiffs' argument instead requires a user to disengage the forks from the pendulum in order to allow the forks to slide along the pendulum. *Id.* Finally, since the claims require that the sleeve must be joined or linked to the resistance transfer apparatus, Defendants argue that if Plaintiffs contend that the central bar of the resistance transfer apparatus forms a part of the sleeve, the claims cannot be infringed because this would require a portion of the resistance transfer apparatus to be joined or linked to itself. *Id.* at 11.

In view of the Court's claim construction, the Court finds that the accused device does not contain all the limitations of the asserted claims. If the sleeve in the accused device is formed by two side forks and the central bar of the resistance transfer apparatus as suggested by Plaintiffs, such a "sleeve" fails to read on to the asserted claims at least three ways.

First, the supposed sleeve in the accused device does not form a single

continuous shape as required by the asserted claims. Rather, the two side forks and central bar of the resistance transfer apparatus comprise three separate pieces that do not affix to one another so as to form a single continuous sleeve.

Second, the Court agrees with Defendants that the central bar of the resistance transfer apparatus forming a part of the sleeve means that a portion of the resistance transfer apparatus is joined or linked to itself in the accused device, which is an illogical result. The central bar cannot serve the dual purpose of being a part of the sleeve and the resistance transfer apparatus.

Third, the Court agrees with Defendants that the alleged sleeve in the accused device does not slidably engage the pendulum as required by the asserted claims. In the accused device, the side forks are only engaged to the pendulum when attached to pendulum via pins. In this engaged state the forks cannot slide along the pendulum. On the other hand, a user can detach the forks from the pendulum by removing the pins, and manually slide the forks along the pendulum. In this conformation the forks drop to the floor unless they are manually held against the pendulum, and are therefore not engaged to the pendulum in any meaningful sense. As such, the accused device does not allow one to simultaneously engage the forks with the pendulum and slide the forks along the pendulum as required by the asserted claims. As an example of a sleeve that slidably engages the pendulum, one embodiment in the '607 patent specification discloses sliding the sleeve along the pendulum while the sleeve encloses and is engaged to the pendulum. In contrast to the accused device, this sleeve encloses and remains flush around the pendulum even if the pins connecting the sleeve to the pendulum are removed.

In summary, Plaintiffs have failed to raise a genuine issue of material fact as to the existence of the required "sleeve slidably engaging the pendulum" and "sleeve pivotably connected to the resistance transfer apparatus" in the accused device. Consequently, the Court concludes that no reasonable jury could find that these required elements exist in the accused device, and therefore, as a matter of law, the accused device does not literally infringe the '607 patent. The Court must therefore turn to whether the accused device infringes the '607 patent under the doctrine of equivalents.

### 3. Infringement Under the Doctrine of Equivalents

#### a. Doctrine of Equivalents Standards

The doctrine of equivalents allows a court to find infringement when the accused device contains elements "equivalent to each claim element of the patented invention[.]" *Warner-Jenkinson Co., Inc.*, 520 U.S. at 40. Courts have developed two tests to decide whether to invoke the doctrine of equivalents. First, an element of an accused device is equivalent to an element of a patent claim if the element of the accused device performs substantially the same function, in substantially the same way, to yield substantially the same result as the element of the patent claim. *Id.* at 39. Second, the doctrine of equivalents allows a court to find infringement when the accused device makes insubstantial alterations that were not captured in drafting the original patent claim, but which were created through trivial changes. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 733 (2002). Thus, the doctrine protects a patentee from "copyists who 'make unimportant and insubstantial changes and substitutions in the patent which, through adding nothing, would be enough to take

the copied matter outside the claim, and hence outside the reach of the law.'" *Id.* at 732-33 (quoting *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 607 (1950)). Under either test, each claim element is material to the scope of the patented invention, and "thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole." *Warner-Jenkinson Co., Inc.*, 520 U.S. at 29. If the doctrine of equivalents encroaches beyond this limit, it would "vitiate the central functions of the patent claims themselves." *Id.* Equivalence is a question of fact. *Graver*, 339 U.S. at 609.

A patentee may be blocked from asserting the doctrine of equivalents due to prosecution history estoppel. A narrowing amendment to a patent claim during prosecution to obtain allowance of the patent that adds an additional claim limitation creates a presumptive surrender of equivalents with respect to that limitation. *Warner-Jenkinson Co., Inc.*, 520 U.S. at 33; *Festo*, 533 U.S. at 741; *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1141 (Fed. Cir. 2004). Put another way, a patentee cannot employ the doctrine of equivalents to recapture what he gave up during prosecution to obtain a patent. A patent owner can overcome the presumption of surrender if the patentee can demonstrate that: (1) "the alleged equivalent would have been unforeseeable at the time of the application;" (2) "the rationale underlying the amendment . . . bear[s] no more than a tangential relation to the equivalent in question;" or (3) there exists "some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question." *Festo*, 533 U.S. at 740-41. The Court must decide, as a matter of law, whether prosecution history estoppel applies. *Glaxo Wellcome, Inc. v. Impax Laboratories, Inc.*,

356 F.3d 1348, 1351 (Fed. Cir. 2004) (citing *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1578 (Fed. Cir. 1997)).

### b. Infringement of the '607 Patent under the Doctrine of Equivalents

In addition to denying literal infringement, Defendants contend that claims 1 and 8 are not infringed under the doctrine of equivalents because prosecution history estoppel prevents Plaintiffs from relying on the doctrine. Defendants further state that the accused device does not infringe claims 1 and 8 under the doctrine of equivalents even of the prosecution history estoppel is not applied. Defendants do not argue that prosecution history estoppel bars the application of the doctrine of equivalents to claim 11, but nevertheless maintain that the accused device does not infringe claim 11 under the doctrine of equivalents. Plaintiffs, on the other hand, argue that prosecution history estoppel is inapplicable to the asserted claims and that there exists a genuine issue of material fact as to whether the accused device infringes claims 1, 8 and 11 under the doctrine of equivalents.

The Court finds that with respect to claims 1 and 8 there is a presumption that prosecution history estoppel applies and that the equivalents at issue have been surrendered. The original independent application claims 1 and 12 were rejected for reasons related to patentability. Specifically, application claim 1 was rejected as anticipated by the prior art and application claim 12 was rejected as obvious in view of the prior art. These rejected independent claims were cancelled and the dependent application claims 5 and 13 were rewritten into independent form to obtain allowance, and became issued claims 1 and 8. The Federal Circuit found that exactly such a scenario gives rise to a presumption of prosecution history estoppel. *See Honeywell*,

370 F.3d at 1141 (rewriting a dependent claim into independent form, coupled with the cancellation of the original independent claim, creates a presumption of prosecution history estoppel).

The Court also finds that Plaintiffs fail to rebut this presumption as to claim 1 and 8 via any of the three *Festo* factors, and as a result, Defendants cannot infringe claim 1 and 8 under the doctrine of equivalents. First, the alleged equivalent was foreseeable at the time the application was filed. The equivalent in question, the alleged sleeve comprised of two side forks and the central bar of the resistance transfer apparatus, is disclosed within the '607 patent itself, except that the side forks are attached to the pendulum via the sleeve as opposed to directly attached to the pendulum as in the accused device. *See* '607 patent, Fig. 1. Second, the rationale underlying the amendments bears more than a tangential relationship to the equivalent in question, because the applicants first attempted to secure claims where the side forks directly attach the resistance transfer apparatus to the pendulum without a sleeve, just as is found in the accused device. The examiner rejected these claims, and the applicants amended the claims to include a sleeve in order to overcome the prior art. The amendment was therefore directly related to the equivalent in question because it was aimed at distinguishing over a configuration substantially similar to that found in the accused device. *See, e.g.*, *Pioneer Magnetics, Inc. v. Micro Linear Corp.*, 330 F.3d 1352, 1357 (Fed. Cir. 2003) (an amendment is not tangential to the equivalent in question if it was made to avoid the very prior art containing the equivalent). Third, Plaintiffs have not and could not have set forth any reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in

question, for the simple reason that the substitute was in fact substantially disclosed in the '607 patent and prosecution history.

Turning to claim 11, the Court will proceed directly to the doctrine of equivalents infringement analysis, because claim 11 was never amended during prosecution and prosecution history estoppel is thus inapplicable. Claim 11 recites "a resistance transfer apparatus pivotably connected to the sleeve by means of a *mounting assembly; the mounting assembly comprising a fork and a pin* for pivotably connecting to the sleeve[.]" (emphasis added). '607 Patent, Claim 11. Unlike claims 1 and 8, claim 11 includes both a sleeve and a mounting assembly, where the mounting assembly includes a fork. However, the side forks of the accused device cannot logically serve the dual purpose of reading onto the sleeve element as well as the fork element. In accordance with *Warner-Jenkinson*, each claim element is material to the scope of the claim and the doctrine of equivalents must apply to individual claim elements. Therefore, the doctrine of equivalents cannot be enlarged to vitiate either the sleeve element or the fork element. As a result, the Court finds that the accused device does not infringe claim 11 under the doctrine of equivalents.

In summary, the Court finds that no reasonable jury could find that the CorEvolution machine literally infringes the asserted independent claims 1, 8 and 11 of the '607 patent. The accused device also cannot infringe claims 1 and 8 under the doctrine of equivalents because prosecution history estoppel bars assertion of the doctrine as to those claims. Though prosecution history estoppel does not bar the application of the doctrine of equivalents to claim 11, claim 11 is not infringed under the doctrine of equivalents. Finally, based upon the Court's finding that the accused device

does not infringe independent claims 1, 8 and 11, which are the only asserted

independent claims of the '607 patent, the Court must also conclude that the accused

device does not infringe upon claims depending from the asserted independent claims

because they include all the limitations of the asserted independent claims. *See, e.g.,*

*Wahpeton Canvas Co., Inc. v. Frontier, Inc.*, 870 F.2d 1546, 1552 (Fed. Cir. 1989)

("One who does not infringe an independent claim cannot infringe a claim dependent on

(and thus containing the limitations of) that claim.") (citation omitted).

## B.  Trademark Claims

Defendants assert a single ground for summary judgment as to Plaintiffs'

trademark claims, namely, that Defendants did not "use" the subject marks.[6]  Plaintiffs

allege that Defendants used Plaintiffs' LOUIE SIMMONS and REVERSE HYPER

marks[7] in violation of three sections of the Lanham Act: (1) trademark infringement

under 15 U.S.C. § 1114(1)(a);[8] (2) trademark dilution under 15 U.S.C. § 1125(c);[9] and

---

[6]  Defendants' argument is apparently so straightforward that they cite no legal authority–neither statutory nor case law–in the trademark portion of their summary judgment motion.

[7]  Plaintiffs have apparently abandoned their claims concerning the alleged use of the WESTSIDE BARBELL mark.

[8]  Under 15 U.S.C. § 1114:

(1) Any person who shall, without the consent of the registrant - (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . (b) . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided.

[9]  Under 15 U.S.C. § 1125(c):

(1) Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

(3) unfair competition, false designation of origin, passing off, reverse passing off, misrepresentation, and false advertising under 15 U.S.C. § 1125(a).[10] The plain text of all three statutes imposes liability only for the illegal "use" of a mark.[11]

## 1. "LOUIE SIMMONS"

Defendants' sole argument with respect to the "LOUIE SIMMONS" mark is that the references in the infomercial were not uses in the "service mark sense." Defs.' Br. in Sup. of their Mot. for Summ. J. at 3 (Doc. 28). Rather, Defendants contend they used "Louie Simmons" only to identify Simmons the individual. Defs.' Reply to Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J. at 6 (Doc. 36).[12]

The issue is whether Defendants' unlicensed mention of "Louie Simmons" is an unlawful trademark use. There are two instances in the CorEvolution infomercial in

---

[10] Under 15 U.S.C. § 1125(a):

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which - (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

[11] Plaintiffs also allege violations of (1) Ohio trademark law under Ohio Rev. Code §§ 1329.54–1329.67, (2) Ohio's Deceptive Trade Practices Act under Ohio Rev. Code § 4165.01, *et seq.*, and the Ohio common law of service marks and trademarks. Ohio trademark claims are subject to the same analysis as Lanham Act trademark claims. *FURminator, Inc. v. Kirk Weaver Enters.*, 545 F. Supp. 2d 685, 691 (S.D. Ohio 2008); *ETW Corp. v. Jireh Publishing, Inc.*, 332 F.3d 915, 920 (6th Cir. 2003).

[12] In the Testimonial Authorization contract, Simmons explicitly released Defendants from any liability resulting from the appearance in the infomercial of Simmons' name, likeness, and "any statement or endorsement, . . . or any portions thereof, . . . made by" Simmons. However, even the Defendants did not interpret these clauses to confer a license to the use of Plaintiffs' trademarks. Specifically, Defendants argued only that Simmons "waived all rights to compensation regarding" "the name and likeness of Louis Simmons[,]" and never made the parallel argument that Simmons waived his rights to the LOUIE SIMMONS mark. Defs.' Br. in Supp. of their Mot. for Summ. J. at 3 (Doc. 28).

which Plaintiffs' mark is arguably offered as a source identifier. These uses take place in an infomercial aimed at selling the machine to the public, and are therefore considered to be "in commerce." In his first appearance in the informercial, Simmons directly segues between a discussion of his inventive activities and the resulting CorEvolution machine: "In 1993 I decided to patent it, making it available to all commercial gyms, major colleges, and chiropractic offices, and pain centers." In Simmons' second appearance, he states how his name is associated with strength training, and then describes the CorEvolution machine: "Because my name Louie Simmons is associated with strength training, umm, many gyms would only buy it for people in the, in the strength activities. They didn't realize that first and foremost it's a rehab device. If my name was Dr. Louie Simmons, I would've already sold millions of these machines." By suggesting that Louie Simmons is the source of the CorEvolution machine, Defendants have arguably used the "LOUIE SIMMONS" mark as a service mark. Accordingly, the Court finds that Plaintiffs have raised genuine issues of material fact as to the existence of infringing uses of the LOUIE SIMMONS mark by Defendants. Summary judgment on this claim is therefore not proper.

### 2. "REVERSE HYPER"

Defendants referenced the REVERSE HYPER mark in commerce when Cook posted on www.goheavy.com.[13] While Defendants argue that the post distinguishes the

---

[13] Cook posted:
"Spread the WORD!!! I have spent almost 4 years working on this project for Louie and it is finally coming together. We have had great success so far and we look to really skyrocket in the months to come The CorEvolution is exactly like the *Reverse Hyper*, but it is very light. . . ." (emphasis added).

two products, and is therefore lawful, the Court finds that the statement as a whole suggests that the two products originate from the same source. Specifically, Cook's statement implies that both products have a common source associated with Louie Simmons. Thus, a genuine issue of material fact exists as to whether Cook's statement, which was posted on a website geared toward the weightlifting community and accessible to any Internet user, was an unlawful use of the REVERSE HYPER mark in commerce. *See, e.g., New York Stock Exch., Inc. v. Gahary*, 196 F. Supp. 2d 401, 413–14 (S.D.N.Y. 2002) (Internet bulletin board posting constituted a use in commerce); *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188 (11th Cir. 2001) (Internet posting of software under filename bearing trademark, where the posting was accessible to anyone with access to the Internet, was a use in commerce).

Defendants' internal communications, however, are clearly not uses in commerce. These communications between John Cook and his work colleagues were not made in the course of trade and had absolutely no effect on commerce as required by 15 U.S.C. §§1114(1)(a), 1125(a) and 1125(c).

In summary, Plaintiffs have raised genuine issues of material fact as to the existence an unlawful use in commerce of the REVERSE HYPER mark by Defendants. Summary judgment on this claim is not proper.

### C. Breach of Contract Claims

The Court finds that genuine issues of material fact are in dispute with respect to Plaintiffs' contract claims and therefore Defendants are not entitled to a summary judgment dismissal of all contract claims.

All of Plaintiffs' contract claims against Defendants require the accused device to be a Licensed Machine under clause 2.3 of the License Agreement or for Defendants to have used the Plaintiffs' LOUIE SIMMONS, WESTSIDE BARBELL or REVERSE HYPER marks. Because the Court has found that Defendants do not infringe the '607 patent, Defendants never used or sold a Licensed Machine. However, Defendants did infringe on the LOUIE SIMMONS and REVERSE HYPER marks. As a result, issues of fact exist with regard to Defendants' breach of contract claims, and the Court retains supplemental jurisdiction over those claims.

### D. Cook's Involvement in this Action

Defendants argue Cook is improperly joined as a defendant in this action because he did not sign the License Agreement in a personal capacity and because his only involvement with the allegedly infringing product and marks is through his relationship as an owner, president and employee of Evolve. Defs.' Mot. for Summ. J. at 18 (Doc. 28).

For the following reasons, the Court finds as a matter of law that Cook is properly named as a defendant in this lawsuit. Genuine issues of material fact exist as to whether Cook is potentially liable for the alleged trademark infringement. As a result, the Court finds, as a matter of law, that Cook is potentially liable for infringement of the LOUIE SIMMONS and REVERSE HYPER marks.

### 1. Cook is not a Party to the License Agreement

The Court finds, as a matter of law, that Cook is not a party to the License Agreement because the plain language of the License Agreement indicates that Plaintiffs are the Licensors and Evolve is the sole Licensee.

Interpretation of the License Agreement is governed by Ohio law, as acknowledged by § 15.1 of the License Agreement. The purpose of contract construction is to discover the parties' intent, which is presumed to reside in the contract's language. *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313 (1996). "The agreement of parties to a written contract is to be ascertained from the language of the instrument, and there can be no intendment or implication inconsistent with the express terms thereof." *Latina v. Woodpath Dev. Co.*, 57 Ohio St.3d 212, 214 (1991) (citation and internal quotations omitted). "[E]xcept where the reformation of a written contract is sought in equity, evidence can not be introduced to show an agreement between the parties materially different from that expressed by clear and unambiguous language of the instrument." *Id.* (citation and internal quotations omitted). "[A] contract is to be read as a whole and the intent of each part gathered from a consideration of the whole." *Saunders v. Mortensen*, 101 Ohio St.3d 86, 89 (2004). The construction of written contracts is a matter of law. *Latina*, 57 Ohio St.3d at 214 (citation omitted).

Defendants allege that Cook is not a proper party to the License Agreement, because the License Agreement explicitly states that it was entered into by Plaintiffs together as Licensor, and only Evolve as Licensee. Defs.' Mot. for Summ. J. at 18 (Doc. 28). Defendants further argue that although Cook signed the License Agreement, he signed in a representative capacity for Evolve, and not in an individual capacity. Id.

Conversely, Plaintiffs argue that Cook signed in an individual capacity, since "there is no indication by his signature that he signed in a representative capacity." Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J. at 31 (Doc. 32). Moreover, Plaintiffs cite

Cook's deposition testimony stating that he believed himself to be personally bound by the License Agreement. *Id.* at 33.

Because the terms of the License Agreement are unambiguous, the Court will look to the contract's plain language. Evolve is explicitly listed as the sole Licensee in all instances. Moreover, the License Agreement repeatedly refers to a single "Licensee," rather than multiple "Licensees." Looking to the contract as a whole, there is no indication that the parties intended to bind Cook to the contract. The fact that Cook signed the License Agreement without an explicit indication that he signed in a representative capacity does not show that Cook intended to make himself a party to the License Agreement. None of the authorities cited by Plaintiffs stand for the proposition that a corporate officer is bound to a contract just because his corporation's name is not listed next to his signature, even where the rest of the contract explicitly names the corporation as the sole party to the contract. Defs.' Reply to Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J. at 17 n.5 (Doc. 36). Because in accordance with *Latina* evidence cannot be introduced to countermand the clear and unambiguous language of the contract, Cook's deposition testimony that he later believed himself to be personally bound to the License Agreement is not enough to counter the plain language of the contract.

In summary, Cook is not a party to the License Agreement. However, the inquiry does not end there, because Cook can still be potentially liable for trademark infringement. The Court now turns to that issue.

## 2. Cook's Personal Liability

The Court finds, as a matter of law, that aside from the issue of whether Cook is a party to the License Agreement, there exist genuine issues of material fact as to whether Cook is personally liable for alleged trademark infringement. Therefore, as a matter of law, the Court holds that Cook is a proper party to this lawsuit.

Corporate officers may be held personally liable for Lanham Act violations. *Sharon Woods*, 2007 WL 4207158 at *1 (citation omitted). First, corporate officers are liable if they personally take part in the infringing activity or direct others to do so. *See, e.g., CCA Global Partners, Inc. v. Carpetmax Flooring Center*, 2006 WL 581016, *2 (W.D. Ky. Mar. 6, 2006) citing J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 25:24 (4th ed. 2005). Second, a corporate officer who is the "sole shareholder, officer, and director of the corporate infringer is personally liable. Such liability does not hinge upon the piercing of the corporate veil." McCarthy, § 25:24 (citing cases).

Here, Plaintiffs have set forth specific evidence that Cook personally took part in or directed others with respect to the use of the LOUIE SIMMONS and REVERSE HYPER marks. Therefore, Plaintiffs have raised genuine issues of material fact as to Cook's personal liability for trademark infringement. Accordingly, the Court declines to grant summary judgment in Cook's favor with respect to Plaintiffs' remaining trademark claims.

## V. CONCLUSION AND DISPOSITION

The Court **GRANTS** Defendants' summary judgment motion in part and **DENIES** it in part. Defendants are entitled to summary judgment of non-infringement of the '607

patent.  The Court finds that genuine issues of material fact exist with respect to

Defendants' use of the LOUIE SIMMONS and REVERSE HYPER marks.  Lastly, the

Court holds that Cook may be held personally liable with respect to Plaintiff's remaining

trademark infringement claims.

The Clerk shall remove Doc. 28 from the Court's Civil Justice Reform Act

motions report.

**IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE
UNITED STATES DISTRICT COURT**